## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**JOHN COLÓN**,
Petitioner,

v.

**COMMISSIONER OF SOCIAL SECURITY**,
Defendant.

Civil No. 19-1014 (BJM)

### OPINION AND ORDER

John Colón ("Colón") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that he is not entitled to disability benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Colón contends that the administrative law judge ("ALJ") erred at steps three, four, and five of the Commissioner's sequential analysis and that certain errors deprived him of due process. Docket No. ("Dkt.") 16. The Commissioner opposed. Dkt. 19. This case is before me by consent of the parties. Dkts. 5, 7. For the reasons set forth below, the Commissioner's decision is **VACATED** and **REMANDED**.

### STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v.*

*Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (quoting *Richardson v. Perales*, 402 U.S. 389, 401(1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).

Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings.

Colón was born on August 14, 1970. Tr. 61. He completed his high school education and began working as a Navy airman. Tr. 41, 50. In the Navy, he would chain down aircrafts on an aircraft carrier, do laundry, wear heavy gear, and do heavy lifting. Tr. 41–43. He also worked various other jobs, including those involving cleaning, maintenance, laundry, and security. Tr. 43–47, 63–64.

Colón reported that he was in a car accident in 1992 and suffered an injury to the right knee. Tr. 66, 71. Although x-rays did not pinpoint a specific problem, he continued to have problems with that knee. Tr. 71–72. His knee would swell, and when he walked, it would lock up, which would cause him to trip or fall. Tr. 73.

In December 2015, Colón took a fall from the second story of his cousin's home and broke his left ankle. Tr. 67–68. He had ankle surgery and was placed on bed rest for three to four months.

Tr. 68. Colón states that his ankle never fully healed, and he experienced pain day and night. Tr. 69. He required the use of a cane or crutches, and sometimes a wheelchair. Tr. 68, 73–74. Colón also developed other health problems, including neck pain, back pain, spasm, alcoholism, and depression. Tr. 78–81, 98.

On April 6, 2016, Colón applied for disability benefits, claiming an onset date of December 12, 2015. Tr. 20. The Commissioner denied Colón's claim initially, on reconsideration, and after a hearing before an ALJ. Tr. 20, 29. The record before the Commissioner, which included medical evidence and Colón's self-reports, is summarized below.

Colón sought treatment for both physical and mental impairments through the Department of Veterans Affairs ("VA"), which treated Colón for joint pain, knee pain, ankle pain, low back pain, hyperlipidemia, asthma, depression, anxiety, insomnia, alcohol abuse, and nicotine abuse. *See, e.g.*, Tr. 98–101, 172–78, 845–51, 975–80. Starting in November 2014, Colón sought treatment for right knee pain. Tr. 136. Early treatment records show that he had difficulty walking, limited range of motion, joint pain, and swelling, though his muscle tone was adequate and he had no deformities. Tr. 107, 109, 131–32, 139. Doctors ordered x-rays and prescribed pain medication and intramuscular injections. Tr. 131–32.

On April 3, 2015, knee imaging showed mild narrowing of the medial distal femoral compartment bilaterally, tiny tibial spine spurs, and mild degenerative changes. Tr. 265–66. There was no fracture, dislocation, bone destruction, or significant knee effusion. *Id.* Right shoulder imaging showed multiple calcifications or small ossified fragments, mild hypertrophic changes, and mild degenerative changes. Tr. 267. Interpreting staff found that these findings might "be related to sequela of remote ligamentous injury." *Id.* Physicians informed Colón that no action was required on his part, and he continued with pain medication. Tr. 104–05.

In December 2015, Colón fell from the second story of his cousin's home. Tr. 67–68, 286. He went to the hospital, where doctors ran several tests, diagnosed him with multiple fractures, and performed surgery. Tr. 278, 283. Left foot imaging revealed "a markedly comminuted fracture involving the distal tibial and fibular metaphysis," ankle dislocation, swelling of the soft tissues,

and calcaneal spurs. Tr. 742. The left ankle had an open wound with a six-centimeter bone protrusion. Tr. 282, 308. A computed tomography ("CT") scan of the facial bones showed a severely comminuted fracture of the nasal bone and a fracture through the nasal septum. Tr. 744, 757. A CT scan of the cervical spine revealed no acute fracture or sublaxation. Tr. 746. Nonetheless, the impression was as follows.

> There is calcification or ossification of the posterior longitudinal ligament resulting in at least moderate spinal canal stenosis from C3 through C6. Superimposed spondylotic changes however, are causing severe multilevel spinal canal stenosis at these levels and likely underlying cord compression. . . . Severe multilevel neuroforaminal stenosis is also noted.

Tr. 746. Imaging of the pelvis revealed osteoarthritic changes in both hip joints, but no acute fracture and symmetric sacroiliac joints. Tr. 742. Left knee imaging showed no evidence of acute fracture or dislocation but revealed tiny patellar spurs and mild narrowing of the joint compartments. Tr. 743.

A surgeon operated on the left ankle, performing an open reduction internal fixation, cleansing, and debridement. Tr. 283. The surgeon inserted a plate, five proximal screws, and two distal screws. *Id.* Colón was stable after the operation, and his ankle was dressed in a splint. Tr. 287. After discharge, he went on bedrest. Tr. 68.

A few months after his fall, Colón applied for disability benefits. The Commissioner sent him to Dr. Luis J. Acevedo-Marty ("Dr. Acevedo-Marty") for a consultative examination, which was performed on June 14, 2016. Tr. 1108. Dr. Acevedo-Marty's findings were largely normal, except for various abnormalities in Colón's gait. Tr. 1115. Dr. Acevedo-Marty observed that Colón was protecting the left leg due to pain and an unstable joint, that he had a lack of balance, and that he used the walls or required assistance for support. *Id.* He also noted that Colón was using crutches, *id.*, and found that Colón had a limited range of motion in the back. Tr. 1117. Dr. Acevedo-Marty reported that Colón's neck, thorax, and extremities were symmetric, and he had excellent sensory function in both upper and lower extremities. Tr. 1111. Colón's arm strength was rated 5/5, his right leg strength was 4+/5, and his left leg strength was 3/5. *Id.* Dr. Acevedo-Marty

diagnosed Colón with chronic left ankle pain, chronic low back pain, chronic bilateral knee pain, major depressive disorder, overweight, status post-left ankle trauma, status post-left ankle open fracture, and status post-left distal tibial fracture. Tr. 1113.

On August 1, 2016, Colón saw a registered nurse, reporting that he was still experiencing pain from his fall in December 2015, including chronic pain in the back and lower extremity. Tr. 220–22. The nurse observed that Colón was using a walking device and that he had a deficit in his gait and balance. Tr. 221. Naproxen relieved the pain, as did position changes and rest. Tr. 220. Walking made the pain worse. *Id.*

Colón returned to the VA on August 10, reporting difficulties walking. Tr. 207. Notes show that his musculoskeletal system was positive for joint pain or swelling, and he had a decreased range of motion in the right knee and left ankle. Tr. 211. His muscle tone was adequate with no deformities. *Id.* Left ankle imaging revealed a comminuted fracture at the distal fibula that had been internally fixated with a plate and screws, an ossified callous formation, a large calcaneal spur at the plantar tubercle, and decreased bone density at the midfoot. Tr. 170. Complete imaging of the spine revealed straightening of the lumbar lordosis which could be reactive to muscle spasm, asymmetric lumbosacral junction transitional vertebra (developmental in nature), and mild L3-L5 degenerative disc intervertebral osteochondrosis with associated spondylosis deformans. Tr. 169. Colón was diagnosed with unspecified abnormalities of the gait/mobility, and VA physicians prescribed him a wheelchair and underarm crutches. Tr. 174. He attended physical therapy for gait training, and he could manage his assistive device safely and effectively. Tr. 207. He was not weight bearing at the time of the appointment. *Id.*

On September 30, Colón underwent a CT scan of the left ankle. Tr. 842. The impression was as follows:

> Post-operative changes with cortical plate and metallic screws fixating a distal fibular fracture which is partially healed callus formation. Chronic fracture and periosteal reaction at the posterior malleolus. Two syndesmotic screws in position with normal alignment of the tibiofibular syndesmosis distally. No radiolucency around the metallic hardware to suggest loosening or infection.

Extensive soft tissue swelling along the medial aspect of the ankle surrounding the medial ankle tendons, medial ankle ligaments likely from underlying ligamentous and/or tendon injury. Particularly posterior tibialis tendon is significantly enlarged with surrounding edematous changes raising the concern for posterior tibial tendon injury or tenosynovitis.

Osteochondral type lesion suspected along the lateral talar dome measuring 5.4 mm.

Moderate size calcaneal spur.

Tr. 842–43.

On October 18, Colón underwent a CT scan of the right knee, which indicated mild osteoarthritic changes, mild to moderate joint effusion, and high-grade articular cartilage loss at the lateral femorotibial compartment. Tr. 275.

On December 7, Colón visited Dr. Luis Acevedo Lazzarini ("Dr. Acevedo Lazzarini"), an orthopedic surgeon, for another consultative examination. Tr. 956. Dr. Acevedo Lazzarini's examination of Colón's lower extremities revealed various deformities. Tr. 959. Colón could neither lift himself on his forefeet nor walk on his heels. *Id.* He had problems with his right knee, including crepitus and a limited range of motion. *Id.* The knee was also enlarged, and the patella had an appositive compressing sign. *Id.* Colón's left ankle was swollen, had a diminished range of motion due to pain, and was painful to palpation. *Id.* He used crutches to stand, and he had difficulty standing from the sitting position. *Id.* Colón's gait was also abnormal. Tr. 958. He was positive for the Trendelenburg test, as he could not stand on the left lower extremities due to pain in the foot.[1] *Id.* He walked with a limping gait on the right side using a crutch to assist his ambulation. *Id.* Upon standing, his shoulders and pelvis were level. *Id.* Dr. Acevedo Lazzarini found that Colón had sensibility of blunt and sharp objects on the soles of his feet, good strength on the hallux, and good sensation in the first inter-digital space. Tr. 959. He observed no limitation in neck motion, no spinal curve, no kyphosis, and no lordosis. Tr. 957–58. Palpation from the

---

[1] The Trendelenburg test is "a test of the valvular competence of the leg veins in which the leg is raised above the level of the heart until the veins are empty and then the leg is rapidly lowered." *Thomas v. Comm'r of Soc. Sec.*, No. 1:10-CV-331, 2011 WL 4352774, at *4 n.1 (W.D. Mich. Aug. 30, 2011*), report and recommendation adopted*, No. 1:10-CV-331, 2011 WL 4352725 (W.D. Mich. Sept. 16, 2011) (citation and internal quotations omitted).

occipital region to the C7 vertebral apophysis was not particularly painful. Tr. 959. Colón's spine

was symmetrical, but palpation elicited pain on the low lumbar area, especially on the sacroiliac

joints and the vertebral apophysis. *Id.* Colón's upper extremities were symmetrical with a

functional range of motion, no inflammatory signs, and no muscle atrophy. Tr. 958. There was

hypertrophy of both acromioclavicular joints, and pronation and supination were limited in both

upper extremities. *Id.* Dr. Acevedo Lazzarini's diagnosis was right knee osteoarthritis, left ankle

traumatic arthritis, and spondylosis lumbar. Tr. 960. He also explained that Colón's conditions

were degenerative in nature and described Colón's functional limitations as follows.

> In spite of the impairment found, the claimant can still: sit continuously. He can stand
> occasionally. He would have difficulty in walking. He could lift 20 pounds. There is
> difficulty of carrying due to the condition of the lower extremities. There is no impairment
> in handling small objects. There is no hearing or speaking impairment. There is mild to
> moderate impairment in traveling in respect to the related orthopedic conditions.

*Id.* Additionally, Colón could walk on level ground. Tr. 962.

Colón continued seeking treatment for knee pain. Tr. 967, 1032, 1042. On January 30,

2017, Dr. Kenneth Cintron-Velazquez found tenderness over the medial knee joint, no effusion,

and a full range of motion. Tr. 1042. He recommended a knee brace and ordered an MRI of the

right knee. *Id.* On March 17, the MRI revealed the following:

> Complex tear of the medial meniscus. Associated mild to moderate osteoarthritic changes
> of the medial femoral tibial joint compartment present. High grade femoral trochlea
> chondromalacia. Mild biceps femoris and popliteus tendinosis. Small to medium-sized
> suprapatellar joint effusion.

Tr. 982.

On April 12, Colón went to the emergency room, reporting that he fell after his knee locked

up. Tr. 995, 1000, 1183, 1290. A laceration to the elbow required sutures, Tr. 998, and his right

knee was injected with Depomedrol and Bupivacaine, Tr. 1003–04. Colón saw Dr. Edgardo

Gonzalez-Ramirez ("Dr. Gonzalez-Ramirez") who noted that Colón ambulated with a cane and

reported medial knee pain of ten out of ten. Tr. 1006. Colón had no deformity and full knee

extension and flexion, but he had quad weakness to manual stress. *Id.* Dr. Gonzalez-Ramirez

reviewed MRI results, stating that they showed "almost obliteration of the medial meniscus (complex tear)." *Id.* Dr. Gonzalez-Ramirez informed Colón that he might need surgery in the future. Tr. 1007.

On June 14, Colón discussed knee surgery with his physicians. Tr. 1134–35. Doctors' notes show that he was ambulating with a cane and was limited in his ability to work. Tr. 1134. Colón's right knee pain had been "unresponsive to conservative management," and he agreed to surgery. *Id.*

Before the surgery, Colón visited a physical therapist. Tr. 1182. The physical therapist noted that Colón had a cane, crutches, and a wheelchair. Tr. 1183. He presented with impaired mobility and a lack of strength consistent with right knee pain. Tr. 1186. He walked with both Canadian crutches and could walk for 1000 feet without assistance. Tr. 1185. Colón's coordination was normal, his balance was good, and he could sit and stand for thirty minutes. Tr. 1184.

On July 20, Colón underwent right knee surgery. Tr. 1161, 1190. The procedures were without complication and included right knee arthroscopy, partial meniscectomy, and synovectomy. Tr. 1190. He was discharged to a wheelchair. *Id.*

On July 25, an orthopedic surgery note shows that Colón was ambulating with one crutch and fully weight bearing. He had full knee extension and flexion to 90 degrees. Tr. 1173. Although he had joint effusion, he did not yet want it removed. Tr. *Id.*

After his knee surgery, Colón participated in physical therapy, generally reporting his pain level as a six out of ten. Tr. 1287, 1288. He had good tolerance for physical therapy and could reduce his pain to a four or five after a session. Tr. 1287, 1289. Physical therapy notes from August 17 show that Colón had no swelling and a normal range of motion. Tr. 1288. However, he was ambulatory with Canadian crutches and had reduced knee strength. *Id.*

On August 30, Colón visited the doctor, reporting a pain level of six out of ten that increased to a nine out of ten when he was seated, extended the knee, or rose to stand. Tr. 1290. He was examined by Dr. Milagros Arroyo-Rivera ("Dr. Arroyo-Rivera"), who reported that knee surgery had exacerbated Colón's lower back pain and caused right lateral hip pain. *Id.* Dr. Arroyo-Rivera

also stated that Colón had difficulty sitting in the bathroom because he could not squat and noted that he had to use a crutch for standing and stability, as he had already fallen. *Id.* She also noted that Colón's personal medical history was significant for impaired walking. *Id.* He had good strength, no asymmetry, and no deformity, but his mobility was slow with a crutch, knee brace, and left ankle orthosis. Tr. 1292. Upon inspection of the range of motion in Colón's knees, Dr. Arroyo-Rivera found full but painful flexion and diminished extension. *Id.* The prognosis was "good." *Id.*

As of November 17, 2017, VA records show that Colón was positive for joint pain or swelling and that he had a slow gait with decreased range of motion. Tr. 1297–98. His muscle tone was adequate, and he had no deformities. *Id.* He continued with medication, including Methocarbamol for muscle spasm and Sulindac for pain. Tr. 1301.

Records also indicate that Colón sought treatment for depression and anxiety starting in 2014. Tr. 850. On January 15, 2015, he saw a social worker, reporting anxiety, insomnia, and sadness. Tr. 114. The social worker described Colón as well-groomed, well-dressed, cooperative, oriented, and without hallucinations or delusions. *Id.* He reported symptoms of sadness, anxiety, irritability, insomnia, anger, and increased tobacco use and alcohol consumption. Tr. 115. He stated that he had been aggressive lately and feared he might harm someone if provoked, and he felt that his symptoms were worsening. *Id.* The social worker found that Colón's symptoms were consistent with a major depressive disorder and generalized anxiety disorder. Tr. 116–17.

On June 7, 2016, Colón visited Dr. Emely Martell Alcover ("Dr. Alcover"), a clinical psychologist, for a consultative examination. Tr. 160. Dr. Alcover found that Colón could handle daily personal hygiene but needed help to bathe standing up and had to get dressed lying down. Tr. 162. He could cook simple meals and drive short distances. *Id.* He could not walk long distances, nor could he climb stairs quickly, stand for long periods, bend, or lift heavy objects. *Id.* Colón could integrate socially, although he reported no motivation to perform social or recreational activities. *Id.* He had adequate tolerance for the stress of daily living. *Id.* His hygiene, personal appearance, and clothing were appropriate, and he maintained adequate eye contact. Tr. 163. Dr.

Alcover found no limitations in Colón's expressive and receptive language and described his verbal expression as fluid, understandable, and appropriate. *Id.* He was also logical, coherent, alert, receptive, and cooperative. *Id.* His thought process was organized and his thought content normal, without suicidal or homicidal ideas. *Id.* Colón had no memory deficits, average intellectual capacity, appropriate social judgment, appropriate behavior, appropriate insight, and the ability to manage funds. Tr. 163–64. His mood was sad, and his chronic insomnia made things more difficult. *Id.*

Progress notes show that Colón continued seeing a psychiatrist and social worker to discuss symptoms of depression and anxiety, which tended to vary in intensity. *Compare* Tr. 227 (reporting an increase of symptoms on August 1, 2016) *with* Tr. 1047 (reporting less frequent and intense bouts of depression on December 8, 2016). Generally, providers observed that Colón had a depressed mood and congruent affect but that he was otherwise oriented alert, attentive, cooperative, and reasonable, with normal speech and language intact. Tr. 184, 200, 1009, 1014, 1025, 1049, 1141, 1169. He never suffered perceptual disturbance and maintained normal thought processes and content. Tr. 184, 200, 1138, 1169, 1181. His judgment and insight ranged from fair to good. Tr. 184, 201, 1025, 1141, 1169. Where his memory was tested, it was intact. Tr. 1018, 1181. A psychiatrist prescribed medication, including Sertraline, Trazadone, and Naltrexone, Tr. 186, and he attended group therapy, Tr. 1146. By December 8, 2016, he reported that he was doing better, and the Trazadone had helped with his depressive symptoms. Tr. 1047. He stated that he felt more optimistic about the future and had adequate concentration, despite occasional sadness and frustration. *Id.* In March 2017, he had no symptoms of depression or anxiety. Tr. 1009, 1023. In June, his symptoms had returned and were worsening, as he had poor compliance with medication. Tr. 1142. On August 9, he was compliant with his medication, which had helped with his mood, irritability, and anxiety. Tr. 116.

Various non-examining state agency physicians reviewed the medical evidence submitted to the Commissioner. On July 12, 2016, Dr. Brenda Concepción found that Colón could occasionally lift twenty pounds and frequently lift ten pounds. Tr. 325. He could stand and/or walk

for four hours, and he could sit more than six hours on a sustained basis in an eight-hour workday. *Id.* He could occasionally climb and frequently balance, stoop, kneel, crouch, and crawl. *Id.* On reconsideration, Dr. Vicente Sanchez found that Colón could occasionally lift twenty pounds and frequently lift ten pounds. He could stand and/or walk for four hours. Tr. 340. He could sit with normal breaks for more than six hours on a sustained basis in an eight-hour workday. *Id.* He could occasionally climb, balance, stoop, kneel, crouch, and crawl. Tr. 341–42. Both mental impairment reviewers opined that Colón's mental impairments were not severe. Tr. 323, 341.

After Colón's claim was denied initially and on reconsideration, he appeared for hearings before an ALJ on February 13 and June 25, 2018. Tr. 36, 57. He testified that he had pain in his right knee, left ankle, neck, and back, and that he had back spasms. Tr. 70, 74, 79. He never fully healed after his ankle surgery, and he still experienced pain day and night. Tr. 69. On a scale from one to ten, with one being minor discomfort and ten being pain so severe that he would be crying and would need to go to the emergency room, he rated the pain in his ankle as a seven to eight. *Id.* In the morning, his pain would be a nine, and he could reduce it to five with pain killers. Tr. 70, 74. The pain was getting worse, so he could no longer sleep. Tr. 75. To get around, he stated that he used a wheelchair or both crutches, although one crutch had been lost in Hurricane Maria and he was waiting for a replacement. Tr. 68, 73–74. Colón reported that, because of his injuries, he could no longer squat, step into the bathtub, or stand without crutches. Tr. 75–76, 79. He could carry a gallon of milk, but he could not bend down to pick anything up. Tr. 76. He estimated that he could walk fifty to one hundred yards and no more than five or ten minutes inside his home.[2] Tr. 70–71, 75. His pain would become unbearable after he had been sitting too long, and he would have to stand up three or four times an hour. Tr. 81–82. He did not drive, and to get around, he would get a ride with his cousin or pay a taxi. Tr. 62. Colón also reported seeing a psychiatrist for depression and struggling with drinking. Tr. 80.

---

[2] The transcript leaves ambiguous whether these estimates refer to walking with or without assistive devices.

The ALJ announced her decision on July 27, 2018. Tr. 30. She determined that Colón had not engaged in substantial gainful activity from December 12, 2015, his alleged onset date, through March 31, 2018, his date last insured. Tr. 22. She found that Colón had the following severe impairments: "left ankle fracture s/p surgery for insertion of metal plate, right meniscal tear s/p arthroscopy, lumbar spine disorder, cervical spine disorder." *Id.* The ALJ determined that, although Colón had been treated for a left elbow condition, bilateral hip osteoarthritis, alcohol disorder, tobacco disorder, anxiety, and moderate depression, none of those conditions imposed more than minimal functional limitations. *Id.* In determining that Colón's depression was not severe, the ALJ considered the four broad areas of mental functioning set out in 20 C.F.R., Part 404, Subpart P, Appendix 1, finding mild limitation in each. Tr. 23–24. At step three, the ALJ found that Colón's impairments did not meet or equal a listing, explaining as follows: "[t]he undersigned specifically considered Listings 1.04 (Disorders of the spine), and 12.04 (Depressive, bipolar, and related disorders) but the claimant's medical conditions did not satisfy the required criteria for the listings of impairment." Tr. 24. Next, the ALJ found that Colón could perform sedentary work[3] with the following limitations:

> [H]e can stand and walk for 2 hours in an 8 hour workday. The claimant uses a cane or a Canadian crutch to stand and ambulate. He can climb stairs and ramps occasionally but never climb ladders, ropes, or scaffolds; he can frequently balance; occasionally stoop, kneel, and crouch; but can never crawl.

Tr. 24–25. In reaching this conclusion, the ALJ discussed laboratory findings showing Colón's ankle fractures, spinal canal stenosis, disc osteochondritis, osteoarthritis, meniscal tear, and suprapatellar joint effusion; treatment records from the VA; documentation of Colón's surgeries; the opinions of consultative and non-examining consulting physicians; and Colón's self-described limitations. Tr. 25–26. She noted that Dr. Acevedo Marty, who examined Colón before his knee surgery, found that Colón suffered from lack of balance and had decreased strength in the arms

---

[3] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a).

and legs. *Id.* Nonetheless, she explained that this observation would need to be correlated with physical therapy notes dated after Colón's knee surgery, which indicated that Colón's symptoms improved with physical therapy. *Id.* The ALJ gave great weight to the opinions of the consultative examiners and little weight to the opinions of non-examining consultants, other than their conclusion that Colón's mental impairments were not severe. Tr. 26. The ALJ also considered Colón's testimony that he needed to get up from sitting three to four times per hour due to low back pain, but she gave this assessment partial weight, finding it inconsistent with objective medical evidence. *Id.* She nonetheless limited Colón to jobs that, with a modified desk, would permit sitting or standing, and by providing that Colón would need to spend three percent of a normal workday off-task. Tr. 26, 29. Next, the ALJ found that Colón could not perform any past relevant work; however, he could perform the work of a charge account clerk, telephone quotation clerk, or telemarketer. Tr. 29. Accordingly, the ALJ found that Colón was not disabled under the Act. *Id.*

The Appeals Council denied review, Tr. 1, and this action followed.

## DISCUSSION

Colón challenges the Commissioner's decision for the following reasons. First, he argues that the ALJ erred in finding that his musculoskeletal impairments and major depressive disorder neither met nor equaled a medical listing. Second, he contends that the ALJ erred at steps four and five by failing to provide a function-by-function analysis. Finally, he maintains that the decision is incomplete and deprived him of due process. I will address each contention in turn.

Colón argues that the ALJ erred at step three by failing to consider listings 1.02(A) (major joint dysfunction) and 1.03 (surgery on major weight-bearing joint) and by failing to find that he met or equaled listings 1.04(A) (disorders of the spine) and 12.04 (depressive, bipolar, and related disorders).[4] At step three, the ALJ asks whether a claimant's impairment or impairments are

---

[4] The Commissioner maintains that Colón fails to offer any citation to the record in support of this argument. Dkt. 20 at 13. I direct the Commissioner's attention to Dkt. 16 at 22, adopting by reference Colón's summary of the medical evidence.

equivalent to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is conclusively found disabled. 20 C.F.R. § 404.1520(d). A claimant bears the burden to show that his impairment meets or equals a listing. *Torres v. Sec'y of Health & Human Servs*., 870 F.2d 742, 745 (1st Cir. 1989). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990), *superseded by statute on other grounds as stated in Kennedy v. Colvin*, 738 F.3d 1172, 1174 (9th Cir. 2013) (emphasis in original).

The ALJ offered the following step-three analysis: "[t]he undersigned specifically considered Listings 1.04 (Disorders of the spine), and 12.04 (Depressive, bipolar, and related disorders) but the claimant's medical conditions did not satisfy the required criteria for the listings of impairment." Tr. 24. She thus did not address listings 1.02(A) and 1.03.

"Courts differ in the extent to which at step three the ALJ must discuss whether the claimant's severe conditions medically equaled a listing, and whether failure to do so constitutes harmless error in view of the ALJ's discussion of the evidence at subsequent steps." *Medina-Augusto v. Comm'r of Soc. Sec.*, No. CV 14-1431 (BJM), 2016 WL 782013, at *8 (D.P.R. Feb. 29, 2016) (collecting cases); *see also Arrington v. Colvin*, 216 F. Supp. 3d 217, 233 (D. Mass. 2016), *aff'd sub nom. Arrington v. Berryhill*, No. 17-cv-01047, 2018 WL 818044 (1st Cir. Feb. 5, 2018). Courts have remanded for an ALJ to consider a listing where "some of the evidence indicates that [claimant] may have met a listing," finding that "the ALJ was required to actually evaluate the evidence, compare it to [the relevant listing], and explain his conclusion." *Lopez Davila v. Berryhill*, No. 17-cv-12212, 2018 WL 6704772, at *16 (D. Mass. Nov. 6, 2018) (citation omitted), *report and recommendation adopted sub nom. Davila v. Berryhill*, No. 17-cv-12212, 2018 WL 6499862 (D. Mass. Dec. 11, 2018); *see also Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 416 (6th Cir. 2011) ("Ultimately, the ALJ erred by failing to analyze [the claimant's] physical condition in relation to the Listed Impairments. Put simply, he skipped an entire step of the necessary analysis. He was required to assess whether [the claimant] met or equaled a Listed

Impairment (such as the one above), but did not do so."). Other courts find no need to remand where "confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination under review," and "no reasonable factfinder could conclude otherwise." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 734-35 (10th Cir. 2005).

Although the First Circuit has not yet weighed in on this issue, *Cano v. Saul*, No. 1:19-CV-11563-ADB, 2020 WL 1877876, at *12 (D. Mass. Apr. 15, 2020), it has explained that "[w]hen an agency has not considered all relevant factors in taking action, or has provided insufficient explanation for its action, the reviewing court ordinarily should remand the case to the agency." *Seavey v. Barnhart*, 276 F.3d 1, 12 (1st Cir. 2001). On the other hand, "a remand is not essential if it will amount to no more than an empty exercise." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 656 (1st Cir. 2000).

Here, the ALJ did not consider listing 1.02(A), major dysfunction of a joint. To meet listing 1.02(A), a claimant must show (1) "gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability)," (2) "chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s)," (3) "findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)," and (4) "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.

Because the regulations do not define "gross anatomical deformity," *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 347–49 (S.D.N.Y. 2020.), courts have relied on the common medical definition of "gross," which "refers to 'coarse or large' and 'visible to the naked eye without the use of magnification.'" *Igo v. Colvin*, 839 F.3d 724, 729 (8th Cir. 2016) (quoting *Dorland's Illustrated Medical Dictionary* 819 (31st ed. 2007)). Colón's medical records include various instances where medical providers note that Colón had no deformities. *See, e.g.*, Tr. 211, 1006. However, they also contain evidence suggesting that Colón has a gross anatomical deformity. Specifically, Dr. Acevedo Lazzarini stated that he found various deformities in Colón's lower

extremities, reporting that Colón's knee was enlarged and his left ankle swollen, both of which are anatomical abnormalities visible to the naked eye. Tr. 959. Dr. Acevedo Lazzarini also observed that Colón could neither lift himself on his forefeet nor walk on his heels, Tr. 959; Dr. Acevedo-Marty observed that Colón had a lack of balance and unstable joint, Tr. 1115; and various records indicate that Colón walked with a limp, suffered from impaired walking ability, or otherwise had a deficit in his gait/balance. Tr. 163, 221, 962, 1177. *See Darabed v. Astrue*, 2011 WL 7456148, *7 (N.D. Ohio Dec. 6, 2011) (finding that the inability "to perform stance and balance" activities and the inability to "heel-toe walk" could lead a reasonable fact finder to reach a determination that a claimant does in fact have a gross anatomical deformity (i.e., instability) within the meaning of Listing 1.02(A)). Further, Colón's left ankle suffered both dislocation and "a markedly comminuted fracture," and at one point, the bone was protruding by six centimeters. Tr. 282, 308, 742. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02 (offering "sublaxation" as an example of gross anatomical deformity). The record thus contains some evidence indicating that Colón had a gross anatomical abnormality.

Additionally, the providers who examined Colón reported that he suffered from joint pain and stiffness, Tr. 169, 211, 1032, 1297; the record contains several instances where physicians documented a limited range of motion, Tr. 152, 211, 959, 1032, 1037, 1180, 1117, 1298; imaging showed joint space narrowing, Tr. 152, 275, 743; and there can be no dispute that Colón's impairments affect his right knee and left ankle, both of which are major peripheral weight-bearing joints under the plain language of listing 1.02(A). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.

Nonetheless, the Commissioner maintains that the ALJ had no need to consider listing 1.02(A) because Colón cannot show that his impairments result in an inability to ambulate effectively, as he uses one Canadian crutch rather than two. Although the record indicates that at different times Colón used a wheelchair, two crutches, or only one cane, I agree with the Commissioner that substantial evidence supports a finding that he generally uses only one cane or crutch, although reasonable minds could differ on this point. However, I do not agree with the

Commissioner's view that an individual who uses only one cane or crutch is de facto precluded from meeting listing 1.02(A).

"Inability to ambulate effectively means an extreme limitation of the ability to walk." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b). It is "defined generally as having insufficient lower extremity functioning … to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* Although this portion of the definition refers to the use of an assistive device that limits the function of *both* upper extremities, this is not the only means by which a claimant may establish ineffective ambulation. *See Dunham v. Astrue,* 603 F. Supp. 2d 13, 19 (D.D.C. 2009); *Moss v. Astrue*, 555 F.3d 556, 562–63 (7th Cir. 2009); *Dobson v. Astrue*, 267 F. App'x 610, 611–13 (9th Cir. 2008). Rather, a claimant who uses only one assistive device but otherwise meets the definition and examples set out in the listing may also have an inability to ambulate effectively.

> [E]xamples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b).

In this case, because the ALJ did not consider listing 1.02(A), she did not ask whether Colón could, for instance, walk a block at a reasonable pace on rough or uneven surfaces, climb a few steps at a reasonable pace with the use of a single hand rail, or otherwise specifically address his ability to carry out routine ambulatory activities, such as shopping and banking. Even assuming that Colón uses only one crutch, records still indicate that he may be unable to perform these activities. Colón's medical providers regularly documented impaired mobility, difficulty walking, and/or an unstable or limping gait. Tr. 136, 207. Dr. Acevedo-Marty noted that Colón required assistance and suffered from a lack of balance, Tr. 1115, and Dr. Acevedo Lazzarini opined that Colón would have difficulty in walking and mild to moderate impairment in traveling, though he could walk on level ground. Tr. 960, 962. Although the record also contains conflicting evidence,

*see, e.g.,* Tr. 1185 (before knee surgery Colón could walk 1000 feet without assistance), it is not a matter for the court to resolve such conflicts in the first instance. Rather, because the record contains evidence suggesting that Colón may meet listing 1.02(A), the ALJ must consider that listing. Failure to do so was error suggesting that the agency "has not considered all relevant factors in taking action." *Seavey*, 276 F.3d at 12.

And I cannot say that the ALJ's subsequent analysis cured any error. The ALJ concluded that Colón uses a crutch or cane to ambulate and that he can walk for two hours in an eight-hour workday. Tr. 24. In reaching this conclusion, the ALJ gave great weight to the opinions of Dr. Acevedo-Marty and Dr. Acevedo Lazzarini, who found that Colón required assistance, suffered from a lack of balance, had difficulty walking, and had mild to moderate difficulty in traveling. Tr. 960, 962, 1115. The ALJ did not explain why Colón could walk two hours per day, despite Dr. Acevedo Lazzarini's opinion that Colón would have difficulty walking. Nor did she discuss Dr. Acevedo Lazzarini's opinion that Colón "could walk on level ground," which could imply that Colón cannot walk on uneven surfaces. Tr. 962. Further, because the ALJ gave little weight to the opinions of the non-consulting physicians, there was no clear physical RFC assessment to support the conclusion that Colón's impairments permit walking for two hours during the workday. Nor does the record contain any complete RFC assessment that post-dates Colón's knee surgery. *See Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d at 7 (1st Cir. 1991) (explaining that to measure a claimant's capabilities, "an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person").

Additionally, the ALJ stated that Dr. Acevedo-Marty's findings (which pre-dated Colón's knee surgery) would have to be considered in light of more recent physical therapy notes (which post-dated knee surgery). Those notes indicate that Colón's symptoms improved with physical therapy, that is, Colón tolerated physical therapy and could reduce his pain from a six to a four or five after a session. Tr. 1287, 1289. The ALJ did not explain, however, how she interpreted other evidence post-dating Colón's knee surgery, which suggested that surgery worsened his condition.

Indeed, the ALJ did not address the observations of Dr. Arroyo-Rivera, who reported that knee surgery had exacerbated Colón's lower back pain and caused right lateral hip pain. Tr. 1290. Dr. Arroyo-Rivera also found that Colón had difficulty sitting in the bathroom because he could not squat and noted that he had to use a crutch for standing and stability, as he had already fallen. Tr. 1290. She also noted that Colón's personal medical history was significant for impaired walking. Tr. 1290. It is not clear that the ALJ considered this evidence. Rather, she relied on evidence indicating that knee surgery may have improved Colón's condition without addressing conflicting evidence.

I thus remain unsure how the ALJ arrived at her conclusion that Colón could walk for two hours during an eight-hour workday and, consequently, I cannot extrapolate from the ALJ's analysis how she might assess Colón's ability to walk a block at a reasonable pace on rough or uneven surfaces. Accordingly, the ALJ's failure to consider listing 1.02(A) was error meriting remand.

Next, I turn to Colón's argument that the ALJ should have considered listing 1.03. To meet listing 1.03, an impairment must involve "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00(B)(2)(b), and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."[5] 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.03. The record shows that Colón underwent surgery on the left ankle and right knee, both of which are major weight-bearing joints. In December 2015, a surgeon operated on the left ankle, which had been fractured and dislocated and from which a bone was protruding. The surgeon performed an open reduction internal fixation, cleansing, and debridement, inserting a plate, five proximal screws, and two distal screws. Tr. 283. Two years later, after an MRI revealed "almost obliteration of the medial meniscus," Tr. 1006, Colón underwent right knee arthroscopy, partial meniscectomy, and synovectomy, and was

_____

[5] "Arthrodesis is a surgical procedure also known as joint fusion, which removes the damaged portion of the joint and is followed by implantation of screws, wires or plates to hold the bones together until they heal, letting the bones grow together or fuse." *Reid v. Astrue*, 2009 WL 368656, at *10 n. 31 (S.D. Fla. Jan.8, 2009) (citations omitted).

discharged to a wheelchair. Tr. 1190. This evidence suggests that Colón underwent reconstructive surgery or surgical arthrodesis. *See Cunningham v. Astrue*, No. CV 11-144 JC, 2011 WL 5103760, at *4 (C.D. Cal. Oct. 27, 2011) (remanding for ALJ to consider listing 1.03 where plaintiff had undergone bilateral pelvic SI joint fixation surgery and rodding of the right femur, which plausibly suggested that she had undergone reconstructive surgery or surgical arthrodesis). As explained above, medical records also indicate that Colón plausibly suffers from ineffective ambulation. Said ineffective ambulation may date back to Colón's ankle surgery in December 2015, and his most recent medical records, dated November 2017, indicate that he continued to suffer from a slow gait and decreased range of motion. Tr. 1298. Accordingly, it is plausible that there was no return to effective ambulation within twelve months of onset. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.03. As such, the ALJ should have considered listing 1.03.

Next, Colón argues that the ALJ incorrectly concluded that none of his impairments met or equaled 1.04(A). Listing 1.04 addresses disorders of the spine. In order to satisfy listing 1.04(A), a claimant must suffer a "[d]isorder[] of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Additionally, the claimant must show

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). Here, the Commissioner correctly argues that the record lacks evidence to support this listing. It is undisputed that Colón suffers from a lumbar spine disorder, and the record shows that he regularly sought treatment for back pain. Complete imaging of the spine revealed straightening of the lumbar lordosis which could be reactive to muscle spasm, asymmetric lumbosacral junction transitional vertebra (developmental in nature), and mild L3-L5 degenerative disc intervertebral osteochondrosis with associated spondylosis deformans. Tr. 169. A CT scan of the cervical spine revealed the following:

There is calcification or ossification of the posterior longitudinal ligament resulting in at least moderate spinal canal stenosis from C3 through C6. Superimposed spondylotic changes however, are causing severe multilevel spinal canal stenosis at these levels and likely underlying cord compression. . . . Severe multilevel neuroforaminal stenosis is also noted.

Tr. 746. Dr. Acevedo-Marty reported that Colón had a limited range of motion in the back, Tr. 1117, and Dr. Acevedo Lazzarini found that palpation elicited pain on the low lumbar area, especially on the sacroiliac joints, and the vertebral apophysis. Tr. 959. However, records indicate that Colón suffered no muscle weakness, and there is no positive straight-leg test. *See* Tr. 109, 211, 958, 959, 1177, 1298. Accordingly, substantial evidence supports the Commissioner's finding that Colón does not have an impairment or impairments that meet or equal listing 1.04(A).

Equally unavailing is Colón's argument that the ALJ erred in finding that his impairments do not meet or equal listing 12.04, which considers depressive and bipolar disorders. A depressive disorder meets a listing if it causes "extreme limitation of one" or "marked limitation of two" of four areas of mental functioning, or if the disorder is "serious and persistent." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. In this case, the ALJ's conclusion that Colón's major depression poses no more than mild limitation on his functioning is supported by substantial evidence. Although the treatment records of Colón's mental health providers reflect that he often experienced a depressed mood, his mental functioning was otherwise largely unaffected. Typically, records show that Colón was oriented, alert, attentive, cooperative, and reasonable, with normal speech and language intact. Tr. 184, 200, 1009, 1014, 1025, 1049, 1141, 1169. He never suffered perceptual disturbance, and he maintained normal thought processes and content. Tr. 184, 200, 1138, 1169, 1181. His judgment and insight were fair or good, Tr. 184, 201, 1025, 1141, 1169, and his memory was intact. Tr. 1018, 1181. At the consultative examination, Dr. Alcover found that Colón could handle daily personal hygiene, cook simple meals, and drive short distances. Tr. 162. He could integrate socially, although he reported no motivation to perform social or recreational activities. Tr. 162. He had adequate tolerance for the stress of daily living. Tr. 162. Dr. Alcover found no limitations in Colón's expressive and receptive language and described his verbal expression as fluid,

understandable, and appropriate. Tr. 163. Colón was logical, coherent, alert, receptive, and cooperative. Tr. 163. His thought process was organized and his thought content normal, without suicidal or homicidal ideas. Tr. 163. He had no memory deficits, average intellectual capacity, appropriate social judgment, appropriate behavior, appropriate insight, and the ability to manage funds. Tr. 163–64. Although Colón's mood was sad and his chronic insomnia made things more difficult, *id.*, Dr. Alcover recorded no serious, extreme, or marked limitations.

Colón highlights providers' notes that reported more serious symptoms, including feelings of aggression. Dkt. 16 at 5–9. He does not, however, point to evidence indicating extreme or marked limitations in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; or adapt or manage himself. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. Nor does he otherwise explain why he believes he meets listing 12.04. Finding ample support for the ALJ's conclusion that Colón's depressive disorder imposes no more than mild limitations, I find no reason to disturb her finding that he does not suffer from an impairment that meets or equals listing 12.04.

Colón also argues that the ALJ erred by failing to perform a function-by-function analysis pursuant to SSR 96-8p. As explained above, in making her RFC determination, it is not clear that the ALJ considered evidence suggesting that knee surgery may have worsened Colón's condition. As such, her RFC determination may change upon remand, and I thus decline to reach Colón's RFC challenge.[6]

Finally, Colón contends that he was deprived of due process, arguing that a portion of the ALJ's decision is missing and that, consequently, he could not properly challenge the decision. The Commissioner argues that the portion of the decision Colón alleges is missing is simply a page break that added blank space to the ALJ's decision. *See* Tr. 27. Because this case must be remanded

---

[6] I also note that, as the Commissioner correctly observed, this portion of Colón's brief includes no citation to the record and no elaboration of Colón's argument. Such an approach risks forfeiture of any argument. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (citations and internal quotation marks omitted).

for consideration of certain listings, I do not reach the constitutional question. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them."). Instead, I leave it to the ALJ to either include the allegedly missing text or eliminate the alleged page break.

In sum, the evidence suggests that Colón has an impairment or impairments that may meet or equal listing 1.02(A) and/or 1.03, although the ALJ did not consider those listings. The record contains some conflicting evidence related to those listings, rendering the outcome unclear, and the ALJ's analysis at later steps does not entirely resolve those conflicts. A full review after remand may not result in a disability finding at step three, but such a possibility cannot be ruled out. Accordingly, remand is in order for consideration of listings 1.02(A) and 1.03 and, if necessary, further development of the record. *See Seavey*, 276 F.3d at 8, 11.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of September, 2020.

*S/Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge